No. 20,880.

THE OUTCAULT ADVERTISING COMPANY, *Appellant*, V. EDWARD
O. SMALLEY et al., Partners as SMALLEY BROTHERS, *Appellees*.

SYLLABUS BY THE COURT.

1. WRITTEN CONTRACT — *Defense* — *Fraudulent Representations* — *Parol
Evidence Admissible.* Where fraudulent representations are pleaded
as a defense in an action on a contract in writing, parol testimony
is admissible to show the fraudulent representations.

2. SAME—*Demurrer.* The demurrer to the plaintiff's evidence was properly overruled.

3. SAME—*Instructions.* There was no error committed in refusing the
instructions requested.

4. SAME—*Fraud of Agent in Procuring—Good Defense.* The fraud of
an agent in procuring a contract, while acting within the scope of his
employment, is a good defense in an action by the principal to enforce
the contract.

5. SAME—*Special Findings—Consistency.* The answers to the special
questions were not inconsistent with each other, nor with the general
verdict.

6. SAME—*Verdict—Evidence.* The verdict and judgment were supported
by evidence.

Appeal from Labette district court; ELMER C. CLARK,
judge. Opinion filed November 10, 1917. Affirmed.

*Paul H. Kimball*, and *Webster W. Kimball*, both of Parsons,
for the appellant.

*John Madden*, and *C. E. Cooper*, both of Wichita, for the
appellees.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff sought to recover judgment
on a written contract providing for the payment of money.
The defendants pleaded fraud and obtained judgment for costs.
The plaintiff appeals.

The defendants signed a written contract stipulating that
they should pay to the plaintiff $2.10 per week, during the
period of one year, for the exclusive right to use certain advertising matter in Parsons. The defense was that the contract had been obtained by false and fraudulent representa-

tions made by the plaintiff's agent; that the agent had represented that he had made arrangements with certain newspapers to carry the advertising matter for five or six dollars per month; that that representation was false; and that the defendants relied upon that representation and believed that it was true, and signed the contract. The evidence to establish this fraud was as follows:

"A. Rounsaville came in and introduced himself with a copy of the Parsons Sun in his hand, told us that he was selling—

"By the Court: Well, if he did, he said something to Mr. Smalley. A. He said he was selling Outcault advertising cuts and he took this paper, spread it out and asked us about what size ad we usually run and took his pencil and showed us the column and size that this cut would occupy and how much space it would leave us for quoting prices, etc., and he told us and in his talk all the way through guaranteed us—

"Objected to by the plaintiff. Objection sustained by the court. Defendants except.

"Q. Just state what he said. A. I am trying to give it as near as I can, I probably can't use the exact words.

"Q. Well, in substance. A. In substance, I am trying to give it that way. He said, 'I will guarantee that you will get this size ad on account of taking the contract with the newspapers for five and six dollars a month,' that was the size and space that we had been paying ten and twelve dollars for.

. . . . . . . . . . . . .

"Q. You may state what, if anything, you said to him. A. That is what I said to him. That it would cost us but very little more on account of being able to get this special rate, the difference in the special rate and the regular rate would, in fact, pay for the Outcault system.

"Q. Was there anything said about the newspapers? A. He said that he had been—he said that he had been to these newspapers, and that he would guarantee that we would be able to get this special rate.

"Q. Now you speak of a special rate that you would be able to get this special rate, now what do you refer to? A. Refer to just what he said, that he had been to the newspapers and that we would be able to get this special rate.

"Q. Now you may state what is the fact as to whether he had any cuts with him. A. He had the copies of cuts of which he used. I presume it would be all right for me to explain that.

"Q. Yes. A. He took these pictures and compared them on the space that we had been in the custom of buying and showed us how much there would be left for quoting prices, etc., then when we received the first of these cuts we discovered that they would practically occupy all of the space when we inserted our name and address, etc.

. . . . . . . . . . . . .

"Q. Now, Mr. Smalley, after receiving these cuts and covering the space you stated to the jury, what difference, if any, would there be in

the advertising rate for the space covered by these cuts and the advertising rates that you had been paying previous to the signing of this order? A. Well, there would be a difference of eight to twelve dollars a month, on account of the increase in space.

"Q. Tell me what special rate Rounsaville said he made with the paper. What special rate did he tell you he had gotten with the local papers? A. He used the expression, he said, 'I will guarantee you get this other space,' and showed us two columns, eight or ten inches long, and said, 'You can get this for six\or six twenty-five a month'; the same space would have cost us ten or twelve dollars.

"Q. Is that the same price that you were paying for your ad? A. What price, how much?

"Q. For the ads you run before you ever entered into this agreement. A. What, six twenty-five?

"Q. Yes. A. No, I had been paying ten or twelve dollars, which he said would cost six or six twenty-five under this special arrangement."

The plaintiff complains of the admission of evidence introduced by the defendants. The evidence complained of is above set out, and was that which was introduced to show that false representations had been made. The plaintiff's criticism of the evidence is that it was parol evidence, and tended to vary and alter the terms of the written instrument. It was competent to introduce parol evidence to show that the contract was obtained by fraud, although that evidence might have proved that the contract made was different from the one signed. (*Brook v. Teague*, 52 Kan. 119, 34 Pac. 374; *Deming v. Wallace*, 73 Kan. 291, 85 Pac. 139; *Hart v. Haynes*, 96 Kan. 262, 150 Pac. 530; *Griesa v. Thomas*, 99 Kan. 335, 161 Pac. 670.)

2. The plaintiff demurred to the defendant's evidence. That demurrer was overruled. The plaintiff complains of the order overruling his demurrer. The evidence to show fraud has been set out in detail. The kernel of that evidence is, "I will guarantee that you will get this size ad on account of taking this contract with the newspapers for five and six dollars a month." As used in the testimony above set out, an ordinary business man would understand by the language quoted, that arrangements had been made with the newspapers to carry the advertising matter at the rates named. The court, in passing on the demurrer to the evidence, was warranted in attaching that meaning to the language used. The evidence tended to show that no arrangements had been made with the

newspapers; that the defendants relied on the representation and believed that such arrangements had been made; and that by that representation the defendants were induced to sign the contract. Therefore, the evidence was sufficient to compel the submission of the cause to the jury for determination of the facts under proper instructions, and the demurrer to the evidence was properly overruled.

3. The plaintiff contends that the court erred in refusing to give instructions requested by him. One of the requested instructions was to the effect that evidence should not be considered for the purpose of explaining, qualifying, restricting, or enlarging any of the terms of the contract. Other requested instructions were, in substance, that since the contract on its face provided that "All promises and agreements are stated herein; verbal agreements with salesmen not authorized," any representation made by the plaintiff which ingrafted upon the contract a condition not appearing therein would not be binding on the plaintiff, and would be no defense. Another instruction asked by the plaintiff was to the effect that any false representations made by the plaintiff's agent would not be binding on the plaintiff, and would be no defense to the action, unless the evidence disclosed that the plaintiff's agent had authority to make the representations. The court did not commit error in refusing to give any of those instructions.

4. The plaintiff complains of the following instruction:

"There is a clause attached to this contract upon which some evidence has been offered and reads as follows:

" 'All promises and agreements are stated herein; verbal agreements with salesmen not authorized.'

" 'You are instructed that if you find and believe from the fair weight of the evidence in this case that the plaintiff's salesman, Mr. Rounsaville, in fact, made any false, fraudulent or untrue representations to the defendants in order to procure this contract, then that particular clause of the contract to which I have just directed your attention would not be a bar to the defense offered by the defendants in this case, and for the reason that a principal may not send an agent out among the public for the purpose of soliciting contracts and after a contract has been obtained or procured because of false and fraudulent representations, the principal will not be permitted to accept the contract and at the same time avoid the effect of such fraudulent statements so made to procure it by having that clause incorporated in the contract; fraud can not be overcome by such a clause.' "

The last half of the last paragraph of this instruction is the particular part complained of.  The complaint is that "it intimated and led the jury to believe that the plaintiff in this case encouraged and expected its agents to procure contracts by .fraud."  The instruction does not bear the construction placed on it by the plaintiff.  The plaintiff can not avoid the fraud of its agent, and enforce the contract.  In other words, after a contract has been procured by the fraud of an agent, the principal can not disregard the fraud, and enforce the contract. (*Victor Sewing Machine Co. v. Rheinschild*, 25 Kan. 534; *Insurance Co. v. Gray*, 43 Kan. 497, 23 Pac. 637; *Bank of Lakin v. National Bank*, 57 Kan. 183, 45 Pac. 587; *Aultman v. Knoll*, 71 Kan. 109, 115, 79 Pac. 1074.)

The principal is bound by the fraud of his agent, while acting within the scope of his employment, although the principal did not authorize nor know of his agent's fraud.   (2 C. J. 849; 31 Cyc. 1583; Note, 1 L. R. A. 144, 145.)

Neither the instruction as a whole, nor that part of which complaint is made, was erroneous.

5.  A verdict was rendered in favor of the defendants, and special questions were answered by the jury.  The plaintiff argues that the answers were inconsistent with each other and with the general verdict.  The questions and answers were as follows:

"1 Q.  Did the agent and salesman of plaintiff, for the purpose of obtaining the contract sued upon from defendants, represent to them that he had made arrangements with the Parsons *Sun*, and other local papers for space to carry the cut and ads of their patrons?  A. Yes.

"2 Q. · Did the agent and salesman of plaintiff, for the purpose of obtaining the contract sued upon from defendants, represent to them that by reason of some arrangement he had made with the Parsons *Sun* and other local papers to carry the cut and ads of their patrons, that defendants would only pay out for advertising space covered by cuts $5.00 or $6.00 per month?  A. Yes.

"4 Q.  Did the agent of plaintiff obtain from the Parsons *Sun* a statement of what the advertising rates of said newspaper were?  A. Yes.

"5. Q.  Did the agent of plaintiff give to defendants an estimate of what he thought the cost of their advertising would be in the Parsons *Sun?*  A. Yes.

"6 Q. · If you answer questions 4 and 5 in the affirmative, was the estimate given by plaintiff's agent based upon the rates of advertising quoted him by the Parsons *Sun?*  A. Yes.

"7 Q. Were the cuts and types of advertising matter which plaintiff delivered to defendants of the same style and size as the paper copies exhibited to defendants by the agent of plaintiff? A. Yes.

"8 Q. Did defendants claim or believe any false and fraudulent repre- sentations had been made to them when they first returned the advertising matter and cuts? A. Yes.

"9 Q. Did the agent of plaintiff for the purpose of obtaining the contract from defendants, make to them any false and fraudulent representations? A. Yes. .

"10 Q. If you answer the foregoing question 'Yes' state what said false and fraudulent representations were? A. By leading defendants to believe he the agent had made arrangement for a special rate."

The answers to the questions were not inconsistent with each other nor with the general verdict.

6. The plaintiff urges that the verdict and judgment were not supported by the evidence. The legal proposition here involved is the same as that which is discussed under the plaintiff's claims on the demurrer to the evidence, and that proposition must be met by the same ruling.

The judgment is affirmed.